See also 141 F.R.D. 556.

In re DOMESTIC AIR TRANSPORTATION ANTITRUST LITIGATION.

This Document Relates To:
All Actions.

Master File No. 1:90–CV–2484–MHS.
MDL No. 861.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 10, 1992.

Mark R. Cuker, Jay S. Cohen, John Philip McCarthy, Philadelphia, Pa., for Robert and Maureen Bernstein, et al.

Edwin C. Schreiber, Keltner & Schreiber, Inc., Los Angeles, Cal., for Lee Reinke Bright.

J. Garrett Kendrick, Long Beach, Cal., for Lee Reinke Bright and Kenneth L. King.

James A. Calhoun, Calhoun, Benzin, Kademos & Heichel, Mansfield, Ohio, for Michael Carey, et al.

Joel C. Meredith, Steven J. Greenfogel, Daniel B. Allanoff, Meredith & Cohen, Philadelphia, Pa., for Michael L. Coben.

Allen D. Black, Fine, Kaplan and Black, Philadelphia, Pa., Michael P. Malakoff Berger, Kapetan, Malakoff & Meyers, Pittsburgh, Pa., for Nancy A. Colbaugh, et al.

Jori Bloom Naegele, Thomas R. Theado, Robert D. Gary, Gary, Naegele & Theado, Lorain, Ohio, for Bernard M. Davidson.

Kenneth A. Jacobsen, Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., for John Paul Decker, et al.

Frances M. Visco, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Lee Dushoff, et al.

Richard S. Wayne, Mark A. Ogle, Strauss & Troy, Cincinnati, Ohio, Dianne M. Nast, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for H. Bradley Eden.

Jerry S. Cohen, Michael D. Hausfeld, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., for Charles Leonard Egan, et al.

Robert A. Skirnick, Wechsler, Skirnick, Harwood, Halebran & Feffer, New York City, for Kenneth A. Elan.

Lynn Lincoln Sarko & Keller Rohrback, Seattle, Wash., for Lisa Fitzpatrick, et al., Peter D. Joers, II.

William E. Haggerty, Morgan, Hallgren, Crosswell & Kane, Lancaster, Pa., for Diane Gitman, et al.

W. Pitts Carr, Carr, Tabb & Pope, Atlanta, Ga., for Mark E. Goldberg, et al.

Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, Pa., for Dennis T. Gorchov, et al.

Steven M. Kramer, New York City, for Gregory Gordon, et al.

Arnold Levin, Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., for Sheldon Gross, et al.

Joseph Goldberg, Carpenter and Goldberg, Albuquerque, N.M., James S. Bailey, Jr., Calkins, Kramer, Grimshaw & Harring, Denver, Colo., for Kathleen Guthrie, et al.

Louis M. Tarasi, Jr., Tarasi & Johnson, Pittsburgh, Pa., David Berger, Berger & Montague, Philadelphia, Pa., for Charles Henry, et al.

Frederick D. Steinhardt, Mason, Steinhardt, Jacobs & Perlman, Southfield, Mich., for John E. Jacobs.

Harvey Greenfield, New York City, for Harold Kahn.

Mario N. Alioto, Trump Oliveira & Alioto, San Francisco, Cal., for Kenneth L. King.

Mark J. McCarriston, Philadelphia, Pa., for Dee Lim, M.D.

Robert M. Roseman, Rudolph, Seidner, Goldman, Rochestie & Salmon, Eugene A. Specter, Philadelphia, Pa., for William Lutz, et al.

David J. Berman, Berman, Berkley, Lasky, San Francisco, Cal., for Heather Louise Martinez, et al.

W. Pitts Carr, Carr, Tabb & Pope, Atlanta, Ga., for Alfred D. Mathewson, et al.

Harold Berger, H. Laddie Montague, Jr., Berger & Montague, Philadelphia, Pa., for Edward P. Marion, et al.

Francis O. Scarpulla, Guido Saveri, Saveri & Saveri, San Francisco, Cal., for John W. Morse, et al.

Dianne M. Nast, Kohn, Savett, Klein & Graf, Philadelphia, Pa., for Thomas P. O'Donnell, et al.

Warren Rubin, Bernard M. Gross, Gross & Metzger, Philadelphia, Pa., for S. Robert Polis, et al.

John A. Cochrane, Cochrane & Breshnahan, St. Paul, Minn., for Claudia Rybak.

Steven M. Kramer, New York City, for Sandra Sandine, et al.

Eugene A. Spector, Philadelphia, Pa., for Issac Stein, et al.

Judah I. Labovitz, Cohen, Shapiro, Polisher, Shiekman & Cohen, Lawrenceville, N.J., for Irv Susson.

Hartley B. Martyn, Cleveland, Ohio, for Audray Wiesen, et al.

William Q. Bird, Steven R. Wisebraum, Atlanta, Ga., Marc M. Seltzer, Gretchen M. Nelson, Corinblit & Seltzer, Los Angeles, Cal., for William J. Winslade, et al.

Vance K. Opperman, Richard A. Lockridge, Opperman, Heins & Paquin, Andrew C. McIntosh, Minneapolis, Minn., for James P. Young, et al.

W. Pitts Carr, Carr, Tabb & Pope, Atlanta, Ga., for Timothy W. Wolfe, et al., W. Douglas Langmack, et al.

Alfred G. Yates, Jr., Nita M. Fandray, Yates and Associates, Pittsburgh, Pa., for Charles Young.

James A. Treanor, III, Dow, Lohnes & Albertson, Washington, D.C., Peter Crane Canfield, Terrence B. Adamson, Dow, Lohnes & Albertson, Atlanta, Ga., Mark Leddy, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for Airline Tarriff Pub. Co., Inc.

Irving Scher, Weil, Gotshal & Manges, New York City, Andrew Steinberg, Dallas/Fort Worth Airport, Tex., Michael A. Doyle, Alston & Bird, Atlanta, Ga., for American Airlines, Inc.

Donald L. Flexner, Crowell & Moring, Washington, D.C., Jefferson D. Kirby, III, Morris, Manning & Martin, Atlanta, Ga., for Continental Airlines, Inc.

Emmet J. Bondurant, II, Bondurant, Mixson & Elmore, John James Varley, Delta Airlines, Inc., Atlanta, Ga., for Delta Airlines, Inc.

Irwin Goldbloom, Latham & Watkins, Washington, D.C., for Midway Airlines, Inc.

S.M. Litvack, Dewey Ballantine, New York City, Joseph Lefkoff, Atlanta, Ga., for Northwest Airlines, Inc.

Joseph B.G. Fay, Morgan, Lewis & Bockius, Philadelphia, Pa., for Pan American World Airways, Inc.

Robert H. Rawson, Jr., Jones, Day, Reavis & Pogue, Cleveland, Ohio, Lee Trammell Newton, Jr., Jones, Day, Reavis & Pogue, Atlanta, Ga., for Trans World Airlines, Inc.

William T. Coleman, Jr., O'Melveny & Myers, Washington, D.C., Steve Clay, Kilpatrick & Cody, Atlanta, Ga., for United Airlines, Inc.

Robert C. Heim, Dechert, Proce & Rhoads, Philadelphia, Pa., David R. Aufdenspring, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for U.S. Air, Inc.

SHOOB, Senior District Judge.

## PRETRIAL ORDER NO. 6

By order dated August 7, 1991, the Court certified these consolidated cases as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and defined the class of plaintiffs as follows:

> All persons in the United States, who, during the period January 1, 1988, to the present, purchased domestic airline passenger tickets from one or more of the defendant airlines for air transportation on a single defendant airline to and/or from a defendant's hub (as defined in ¶ 23 of Plaintiffs' Amended Consolidated Complaint), (but excluding defendants, their parents, subsidiaries and affiliates and the directors, officers and employees of defendants, their parents, subsidiaries and affiliates and all governmental entities).

Pretrial Order No. 3 at 46. The Court must now decide the method to be used to notify the class members and the content of the notice. For the reasons stated and as outlined below, plaintiffs are directed to proceed with notice by publication.

### I. *Background*

At the time the Court certified the class, it directed the parties to confer concerning the content, timing, and method of notice to be given to the class and to present to the Court written statements as to any agreements reached and the parties' respective positions concerning any areas of disagreement. Pretrial Order No. 3 at pp. 46–47. The Court also set a schedule for the submission of each party's notice proposal. Subsequent to class certification, the Court held a hearing at which it preliminarily approved the proposed settlements that have been reached between plaintiffs and defendants Northwest Airlines, Inc. ("Northwest") and Trans World Airlines, Inc. ("TWA").[1] All parties agree that joint

---

1. The settlement class is somewhat different from but includes the certified class and consists of all persons in the United States who, during the period January 1, 1988, to August 7, 1991, purchased domestic airline passenger tickets from one or more of the defendant airlines

for air transportation to or from a defendant's hub (as described in paragraph 23 of plaintiffs' Complaint) or on a single airline connecting at a defendant's "hub" (but excluding all governmental entities, defendants, their parents, subsidiaries, and affiliates and the directors, offi-

issuance of the settlement notice with the class certification notice is appropriate in this case.

An evidentiary hearing was conducted on October 22, 1991, concerning the proposed content, timing, and method of notice.[2] The parties agreed on much of the content of the notice, yet they were unable to agree on the method of notice. Plaintiffs contend that the best method of notification is a massive publication program. Plaintiffs argue that class members—that is, purchasers of tickets—cannot be identified with reasonable effort and thus there is no list of class members to which mandatory individual mail notice can be given. Defendants insist that it is possible to identify a partial list of class members and that plaintiffs must, therefore, individually notify the persons on the partial list, as well as notifying by publication those who cannot be identified. Defendants also insist that plaintiffs should be required to compile a similar list of class members by searching the records of the settling and bankrupt defendants.

## II. *The Method of Dissemination of the Notice*

■ Federal Rule of Civil Procedure 23 vests the Court with broad discretion to administer the class proceedings before it. *In re Nissan Motor Corp. Antitrust Litigation*, 552 F.2d 1088, 1096 (5th Cir.1977). Rule 23(c)(2) governs the type of notice to be given in this case and provides that plaintiffs "shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." As the Supreme Court has noted the "right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Accordingly, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* (citations omitted).

■ The Supreme Court has also declared that Rule 23(c)(2) includes an "unambiguous requirement" that "individual notice must be provided to those class members who are identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175–76, 94 S.Ct. 2140, 2151–52, 40 L.Ed.2d 732 (1974). However, "no single formula can be derived which will anticipate the myriad of circumstances that may confront class action litigants attempting to identify absentee class members of a

cers and employees of defendant, their parents, subsidiaries and affiliates).

**2.** The Court set aside three days for the evidentiary hearing. The parties were permitted, but not required, to present direct testimony by affidavit so long as the witness would be available in court for cross-examination. Each side was required to submit a witness list and the parties took extensive depositions of witnesses listed. At the hearing, the parties agreed to waive presentation of in court direct testimony of several witnesses and instead submitted testimony by affidavit and deposition. Each side presented in court direct testimony of one witness. Plaintiffs presented that of Todd B. Hilsee, their media expert, and defendants presented that of Thomas Weldon, a representative of Delta Airlines, Inc. ("Delta"). Plaintiffs also submitted the direct testimony by affidavit of Peter N. Thompson, who was deposed by the defendants, and of Arthur M. Kaplan. Plaintiffs submitted deposition testimony from various representatives of the airline defendants who had given affidavits in opposition to Plaintiffs' Preliminary Plan of Administration. Defendants submitted direct testimony by affidavit and deposition of Girina C. Dong, a representative of TRW, Inc. ("TRW") Ken Demma of American Express; Patricia Volpe of Citicorp; Louis Iannuzzelli of Direct Marketing Technology; and John Collazo of Discover; and by affidavits of James Barrett of USAir, Inc. ("USAir"); Nancy C. Kirby of American Airlines, Inc. ("American"); Richard E. Seitz of United Airlines, Inc. ("United"); and Thomas Alfred Weldon of Delta. Throughout this order, all references to affidavits, unless otherwise stated, are to affidavits submitted by plaintiffs in support of or by defendants in opposition to plaintiffs proposed notice program. All references to the transcript of the evidentiary hearing on notice held on October 22, 1991 are to "Tr. at ___."

23(b)(3) action and resolve whether the effort is reasonable." *Nissan*, 552 F.2d at 1097. Rather, what amounts to reasonable efforts under the circumstances is for the Court to determine after examination of the available information and the possible methods of identification.

> Receipt of actual notice by all class members is required neither by Rule 23 nor the Constitution.... What efforts are reasonable under the circumstances of the case rests initially in the sound discretion of the judge before whom the case is pending.... [T]he fact that notice to some class members must be given by publication is not necessarily fatal. In all cases the Court should strike an appropriate balance between protecting class members and making Rule 23 workable.

Manual for Complex Litigation Second § 30.211. *See also In re "Agent Orange" Product Liability Litigation*, 818 F.2d 145, 168 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647, 648 (1988) ("Rule 23, of course, accords considerable discretion to a district court in fashioning notice to a class." ); *Berland v. Mack*, 48 F.R.D. 121, 129 (S.D.N.Y.1969) ("Rule 23 contemplates cooperative ingenuity on the part of counsel and the court in determining the most suitable notice in each case.");

There is no question that where the name and last known address of a class member or individual party is known or is capable of being readily identified from available business or public records, individual notice must be given. *Eisen*, 417 U.S. at 175, 94 S.Ct. at 2151 (parties had access to computer listings that contained the names and addresses of 2,250,000 odd lot traders, readily identifiable as class members; the *Eisen* Court held that the rule required notice by mail to each of the individual class members on the list and notice by publication to non-identified class members); *Mullane*, 339 U.S. at 308, 70 S.Ct. at 654 (beneficiaries' names and addresses were in records of the trustee); *Schroeder v. New York*, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (notice of condemnation proceedings not posted on condemned property or mailed to owner although City had owner's name and address). However, where the names and addresses of the entire class are not readily available from existing records, individual notice is only required under Rule 23 where identification is possible through reasonable efforts.

Thus, in the first instance, this Court must determine, as a matter of fact, whether class members can be identified through reasonable effort. If class members cannot be so identified, there is no other requirement of mandatory individual notice, and the Court must exercise its discretion to provide the best notice practicable under the circumstances. *See Agent Orange*, 818 F.2d at 169.

### A. Identification of Class Members Through Reasonable Efforts

█ The class in this case consists of purchasers of air transportation from defendants, as distinguished from travellers on defendant airlines. Plaintiffs contend there is no reasonable method of identifying these purchasers of air transportation and, therefore, it is impossible to notify by mail any class members. Defendants argue that reasonable methods exist and that, in any event, plaintiffs have made no attempt to identify purchasers. Defendants contend that plaintiffs' refusal to initiate an attempt to identify class members forced them to develop a review process for identifying a list of potential class members.

The Court is surprised by defendants' recent insistence that plaintiffs have failed to compile a list of identifiable class members who must be notified by personal notice. From the start of this litigation, defendants have regularly represented to plaintiffs and to the Court that class members could not be identified from the airlines' records. For instance, early in the litigation, plaintiffs attempted to discover whether the purchasers of airline tickets could be identified. Defendants were requested to:

> Identify all files, records, or other documents that you use or maintain or have

available that contain the names and addresses or otherwise identify passengers on domestic airline flights or purchasers of passenger air transportation services, and describe what other information is contained therein, how such information is retrieved and the period of time for which such information is kept.

Plaintiffs' Interrogatory No. 6. Each defendant responded, describing the various records it keeps and stating that it had no data from which the purchasers of airline tickets could be identified.[3]

Defendants reiterated their position that purchasers could not be identified in other filings made in this case. In Defendants' Joint Preliminary Report submitted to the Court in December of 1990, defendants stated that class certification would be complicated by the "airlines' inability to identify 'purchasers'." Defendants' Joint Preliminary Report at p. 5. American Airlines, in its supplement to the Joint Report argued that, "the plaintiffs cannot even identify the members of the purported class, and American's records will not cure

that fundamental problem because they do not reveal the names of the purchasers of its tickets." American Airlines Supplement to Defendants' Joint Preliminary Report at p. 2.

Furthermore, in response to plaintiffs' motion for class certification, defendants argued vehemently that certification was inappropriate because, among other things, "there is no *practical* way to identify airline passengers, much less the purchasers of airline tickets for those passengers, over the last three years." Defendants' Opposition To Plaintiffs' Amended Consolidated Motion For Class Certification at p. 34 (emphasis supplied). At that time, each defendant by affidavit described the records it kept and again stated that no record of the identity of class members existed.[4]

It was not until the Court requested from each side, on the eve of class certification, a preliminary plan for the administration of claims that defendants did an about face concerning identification of class members.[5] *See* Defendants' Response to Plain-

3. Defendant Delta responded that it could not determine which passengers were also purchasers of airline tickets. Delta's Answer to Plaintiffs' Interrogatory No. 6. Defendant USAir answered that it maintains no separate records for purchasers of passenger air transportation services. USAir's Answer to Plaintiffs' Interrogatory No. 6. Defendant American indicated that it was unable to identify from its records the names and addresses of persons who have flown to, from, or through particular airports and that it "maintains no records identifying the *purchasers* of tickets, as distinguished from the *passengers.*" American's Answer to Plaintiffs' Interrogatory No. 6 (emphasis in original). Defendant United responded that it: "has no files or documents that contain the names and addresses of passengers on domestic airline flights [and] has no files or documents that identify purchasers of domestic air transportation services." United's Answer to Plaintiffs' Interrogatory No. 6.

4. Delta indicated that it "does not have records that would allow it to identify the actual purchasers of its airline tickets." Affidavit of Dan Cupertino at ¶ 19, Vol. II of Appendices to Defendants' Opposition to Class Certification. United stated in its affidavit that, "[e]ven if United were to have retained the actual tickets for all flights, United could not determine the identity of the actual purchaser of the ticket.... Because nothing in our records enables us to

tell who actually paid for a ticket, we cannot determine whether any individual passenger even paid for his or her fare." Affidavit of Henry W. Lilly at ¶ 36, Vol. II of Appendices to Defendants' Opposition to Class Certification. On behalf of USAir, Gary M. Harig swore that "[n]othing in any of our records would enable us to tell who actually paid for the ticket; nor can we identify for any particular purchaser what flights were taken at what price." Affidavit of Gary M. Harig at ¶ 42, Vol. II of Appendices to Defendants' Opposition to Class Certification.

5. At the evidentiary hearing on notice, defendants' counsel insisted that statements made in the affidavits and responses to discovery and in class motion briefs were not contrary to their present position that the credit card numbers in their records can be used to identify the names and addresses of class members. What defendants now purport to have meant initially was merely that the names and addresses of purchasers did not appear in their records. Tr. at 32–33; 49–54. The Court finds this argument hardly persuasive. As noted above, in their brief in opposition to class certification, defendants collectively made the categorical assertion that "there is no practical way to identify airline passengers, much less the purchasers of airline tickets for those passengers, over the last three years." Defendants' Opposition to Class Certification at p. 34. Defendants possessed the same

tiffs' Preliminary Plan for Administration of Claims, August 2, 1991. Defendants now claim that their records contain sufficient information that, combined with databases of third parties, will provide names and addresses for some individuals who purchased tickets on class flights. Working with TRW, a credit reporting agency,[6] and American Express, Citicorp, and Discover, the defendants have developed a list that purportedly contains more than 9,300,000 names and addresses of possible class members (the "TRW list"). Defendants contend that the efforts undertaken to develop the list were reasonable and should be duplicated by plaintiffs in compiling lists of class members from the settling and bankrupt defendants. More important, defendants argue that the TRW list is a list of class members and that plaintiffs must therefore notify the persons on that list individually by mail.

An examination of the evidence before the Court, however, reveals that the list developed by the defendants is not a list of class members. Moreover, after a review of the evidence presented to the Court in the form of affidavits, depositions, answers to discovery, filings made in this litigation, and in court testimony, the Court finds as a fact that class members cannot be identified at this time through reasonable effort. Furthermore, the evidence and numerous

earlier statements by defendants indicate there are no methods, reasonable or unreasonable, other than the convoluted and arguably inaccurate process proposed by defendants, for compiling a list of undisputed class members. Even defendants, with full access to their own records, have been unable to identify the purchaser-class members. Using their in-house expertise and familiarity with their own databanks, and working with several third parties, defendants have compiled a list of more than 9.3 million names and addresses of persons associated with credit card numbers—but not a list of class members.

### 1. Identification of Class Members
#### a. Compilation of the TRW List

Each defendant maintains on its computer database, for different time periods, some information retrieved from airline tickets.[7] The ticket coupon itself contains certain standard information. For example, the coupon utilized by Delta, which is the standard in the industry, contains information from which it can be determined whether a trip is included within the class. Tr. at 119. The ticket contains the date of issue and the cities of origin and destination. *Id.* at 119–120. The ticket also contains the name of the passenger and the method used to purchase the ticket. The face of the ticket, however, does not con-

information when they claimed it was impossible to identify class members as they now possess, yet they claim to have readily identified a list of class members.

**6.** TRW is a credit reporting agency that maintains credit data on particular consumers received from more than 100,000 subscribers. Deposition of Girina C. Dong, 10/11/91, at pp. 49–50. TRW maintains much of the credit data, including some credit card information, in its master consumer database (the "master file"). *Id.* at p. 49. That master file, however, does not contain a specific match of credit card numbers with a name and address. *Id.* at p. 52. TRW also maintains in its databanks a list of 300,000,000 credit card numbers; this list, however, does not contain names and addresses, and TRW does not know how many of the 300,000,000 numbers can be matched to names in the TRW master credit file. *Id.* at pp. 34; 56–57.

**7.** Each airline defendant maintains the information from the ticket coupons on its computer-

ized database for different periods of time. Delta maintains its records for 15 months. Affidavit of Thomas Alfred Weldon of Delta at ¶ 3. USAir had approximately three months during the class period in its database. Affidavit of James Barrett of USAir at ¶ 3. United maintains most ticket records for six months. Affidavit of Richard E. Seitz of United at ¶ 6. American Airlines is the only defendant that maintained the data in computer form for the entire class period. Affidavit of Nancy Kirby of American Airlines at ¶ 4. Initially, American Airlines advised plaintiffs and the Court that it was unable to identify from its databanks which records were within the class definition. In its answers to plaintiffs' Interrogatory No. 6, American Airlines stated that its records were not: "maintained or organized in such a manner that it would be feasible to produce a list, organized (footnote on next page) by passenger name, which would identify particular flights taken and fares paid by all or even most passengers during the relevant period." American Airlines' Answer to Plaintiffs' Interrogatory No. 6.

tain the name of the person who actually paid for the ticket. *Id.* at 124. Instead, the ticket indicates whether the purchase was made by credit card, contains the credit card number, and identifies by the first two characters of the card number the credit card company. *Id.* at 125.

Beginning in about June, 1991, the defendant airlines began to develop computer programs to read the flight coupon records that had been maintained in their computer database to determine whether the coupon was issued for a class flight and, if a credit card had been utilized in the purchase, to extract that credit card number. Defendants' Response to Plaintiffs' Preliminary Plan of Administration, Vol. II, Appendix Exhibits 3, 4, 5 and 6. The newly developed programs extracted the credit card numbers from the segregated coupons and eliminated duplicate numbers to the extent possible. Barrett Affidavit at ¶ 4; Kirby Affidavit at ¶ 3; Seitz Affidavit at ¶ 8; Weldon Affidavit at ¶¶ 12, 16. The airlines then sent the list of credit card numbers for Visa/Mastercard accounts to TRW, for American Express to American Express, for Discover to Discover and for Diners Club/Carte Blanche to Citicorp to have these companies match the card numbers with names and addresses in each of those companies' data banks. Barrett Affidavit at ¶¶ 5–6; Kirby Affidavit at ¶ 15; Seitz Affidavit at ¶¶ 13–16; Weldon Affidavit at ¶ 20. American Express, Citicorp, and Discover subsequently sent their tapes of names and addresses to TRW for final processing. Affidavit of Girina C. Dong at ¶ 2; III; ¶ 10.

When TRW received the files from each airline that contained the MasterCard and Visa credit card numbers, it began the process required to match the card numbers to names and addresses. Deposition of Girina C. Dong, 10/11/91, at p. 38. TRW matched its master file with the file containing the Mastercard/Visa credit card numbers received from the airlines, and the output of that match was then compared through the use of CIDs [8] to another TRW file that contains names and addresses. *Id.* at pp. 58–61; 65–69. After several steps to eliminate duplicate numbers and outdated or incomplete records, TRW was able to match approximately 4.5 million Visa/MasterCard account numbers to names and addresses. Dong Affidavit at ¶ 9I.

The airlines instructed TRW to match the credit card numbers with names of individuals who were in some sense responsible for an account and requested that TRW identify more than one individual per account number if the individuals met certain criteria determined by reference to Equal Credit Opportunity Act ["ECOA"] codes. Dong Affidavit at ¶ 2; 9I; Dong Deposition, 10/11/91, at pp. 96–97. The ECOA code for a particular individual is provided by the TRW subscriber submitting data on that individual. Dong Deposition 10/11/91 at p. 85.[9] The ECOA Codes are interpreted such that "responsible" parties are those associated with the ECOA Codes 1, 2, 4 or 7 and "nonresponsible" parties with Codes 0, 3 or 5. Dong Affidavit at ¶ 9I.

The airlines instructed TRW to include on its final output tape for Visa and MasterCard the individuals who meet the following criteria: (i) if all names associated with a single credit card account were coded responsible, TRW included all those names

---

**8.** A CID is an index that contains information on a consumer; there is one consumer per CID. TRW, however, can have multiple CIDs for the same consumer. The CID is built partly from a person's surname, first name initial, and street address. If, for example, a consumer moved or married or divorced with a name and address change, there would be two different CIDs for the same consumer. TRW acknowledges that there can be several CIDs for one consumer,

and its representative testified that, "it is not for TRW to second guess if these consumers are indeed the same person or different persons and for that reason [TRW] will have multiple identities for the consumers, for one consumer." Dong Deposition, 10/11/91, at 67–68.

**9.** The ECOA codes utilized by TRW are described on the following chart attached to Ms. Dong's Affidavit.

on its list (ECOA Codes 1, 2, 4 and 7); (ii) if all names associated with a single credit card account were coded nonresponsible, TRW included all those names on its list (ECOA Codes 0, 3 and 5); (iii) if some names associated with a single credit card account were coded responsible and others were coded nonresponsible, TRW included all responsible names but eliminated non-responsible names from its list; and (iv) if a name had a code "on behalf of," TRW eliminated the name altogether (ECOA Code 6). Dong Affidavit at ¶ 9I; Dong Deposition, 10/11/91, at pp. 96–97. As a result of this process, although there were only 4,498,561 credit card numbers for MasterCard and Visa, TRW ended up with 5,753,760 names and addresses or almost 30% more names and addresses than card numbers. Dong Affidavit at ¶ 9I; Dong Deposition, 10/18/91, at pp. 10–11.

*ECOA Association Codes*

Association Codes are used to identify an individual's association with the account in compliance with the Equal Credit Opportunity Act (ECOA)....

Association Code        Definition

**0**      UNDESIGNATED

**1**      INDIVIDUAL

This individual is the only person associated with this account.

**2**      JOINT ACCOUNT/CONTRACTUAL
RESPONSIBILITY

This individual is expressly obligated to repay all debts arising on this account by reason of having signed an agreement to that effect. There are others associated with this account who may or may not have contractual responsibility.

**3**      AUTHORIZED USER–JOINT ACCOUNT

This individual has use of this joint account for which another individual has contractual responsibility.

**4**      JOINT ACCOUNT

This individual participates in this account. The association cannot be distinguished between Joint Account–Contractual Responsibility or Authorized User.

**5**      CO–MAKER

This individual has guaranteed this account and assumes responsibility should maker default. This code only to be used in conjunction with code 7 (Maker).

**6**      ON BEHALF OF

This individual has signed an application for the purpose of securing credit for another individual, other than spouse.

**7**      MAKER

This individual is responsible for this account, which is guaranteed by a Co–Maker. To be used in lieu of codes 2 and 3 when there is a code 5 (Co–Maker).

**T**      TERMINATED ASSOCIATION

This individual has terminated his association with this account.

**X**      CONSUMER DECEASED

The individual associated with this account is deceased.

Likewise, Discover matched the card numbers received from the airlines against its data banks and produced a tape containing 697,015 names and addresses of persons financially responsible for 470,947 Discover accounts or 226,068 (48%) more names and addresses than card numbers. Collazo Affidavit at ¶¶ 9–10; Collazo Deposition at pp. 139–140. On the other hand, the tape compiled by Discover does not contain the names and addresses of persons authorized to use a Discover account but not liable for payment of amounts billed to that account. Collazo Affidavit at ¶ 12; Collazo Deposition at pp. 145–146; 154.

The tapes containing the Diners Club and Carte Blanche account numbers were sent by the airlines to Citicorp Diners Club Inc. ["CDCI"] which then had Direct Marketing Technology ["DMT"] perform the matching. Patricia Volpe Affidavit at ¶ 5; Louis Iannuzelli Affidavit at ¶ 5. CDCI requested DMT to process each tape containing card numbers against CDCI's personal and corporate cardholder data bases to identify the names and addresses of cardholders associated with the accounts. Iannuzelli Affidavit at ¶ 4. DMT was instructed to and did match the numbers with the name and address of the primary cardholder only, that is, the person who was issued the card and who is contractually responsible for payment. Names and addresses of persons authorized to use the card but not contractually responsible were not included. Volpe Affidavit at ¶ 4.

American Express matched the American Express card account numbers received from the airlines with names and addresses associated with those numbers in American Express Travel Related Services Company Inc.'s database. Ken Demma Affidavit at ¶¶ 6–7. American Express was requested to furnish names and addresses of only those persons financially responsible for the account. American Express included only the basic cardmember's name and address for each individual account. Persons authorized to use the card were not includ-

ed. *Id.* at ¶ 8. American Express also offers corporate card accounts. Billing statements for charges made on those cards are sent either to the individual in whose name the card is issued or to the corporation, as determined by the applicant for the corporate card account. The name and address tape compiled by American Express for the airlines contains only the billing name and address for the corporate accounts regardless of who, as between the individual and the corporation, paid for the airline ticket. *Id.* at ¶ 11.

### b. Substance of the TRW List

TRW merged the tapes of names and addresses it received from Discover, Citicorp and American Express with its MasterCard/Visa files. Dong Affidavit at Section III, ¶¶ 10–12. The final records contain the names and addresses of persons somehow associated with credit card numbers allegedly used to purchase some class flights.[10] TRW produced 9,333,998 names and addresses associated with far fewer credit card numbers. *Id.* at ¶ 12.

The Court finds several deficiencies·in the process used to compile the TRW list and in the substance of the list itself. First, in the instance of a credit card with which there are associated only nonresponsible names, only one of those parties purchased the ticket that produced that card number. Under the methodology employed by the defendants, however, all of those names, and not just the purchaser's name, will appear on the TRW list. There is no way to determine who the purchaser was among the multiple parties, nor is there any indication from the credit card company, because they do not have that information, which one of the multiple nonresponsible persons in that instance was the purchaser. Dong Affidavit at ¶ 9I.

Likewise, the TRW list contains a category of credit card accounts that have multiple users attached to them, some of whom, for purposes of ECOA credit rating or coding, are classified as responsible and some of whom are classified as nonresponsible.

---

10. While the Dong Affidavit states at paragraph 2 that TRW was required to match numbers with individuals responsible for those accounts, that is not accurate. TRW was instructed in certain instances to include nonresponsible individuals. Dong Affidavit ¶ 9.1 and Exhibit A.

*Id.* and Exhibit A. Under the methodology used by the defendants to design the TRW list, if the purchaser of the ticket was a nonresponsible person in that situation where there is also a responsible person attached to the credit card used to purchase the ticket, the name of that purchaser will not show up on the TRW list, but one of the responsible people or the multiple responsible people who did not purchase the ticket will show up on the list. Dong Affidavit at ¶ 9I.

In addition, there is little dispute that the TRW list also contains substantial duplication. One of the categories that appear on the TRW list includes credit card numbers to which are attached the names of multiple "responsible" parties. Only one of the several people associated with a particular card as "responsible" bought the ticket that produced that card number. Under the system that the defendants have designed, however, all their names will appear on that list, and there is no way to tell from the list which one of the responsible people was the person who actually purchased that ticket. Dong Affidavit at ¶ 9I. The airlines instructed TRW that only nearly exact duplications between names and addresses should result in elimination.[11] Dong Deposition, 10/18/91, at pp. 25–27. In addition, where application of the Postal Service's National Change of Address review showed no valid address and no forwarding address, the airlines instructed TRW that the name and address in the TRW file be included anyway. Dong Affidavit at ¶ 9E. TRW was likewise instructed by the airlines to retain the names and addresses of deceased individuals. Dong

Deposition, 10/11/91, at pp. 104–105; Dong Affidavit at ¶ 9I. The airlines also decided that the final output tape would have one name/address per record, so that if a husband and wife reside at the same address, two mailings would be required. Dong Deposition 10/11/91 at pp. 131–135. In setting the parameters for TRW to follow, the airlines apparently chose the method to recognize duplication that would result in retention of the largest number of names and addresses.

The TRW tape also contains data for non-class flights. For example, data for two months sent from Delta to TRW and the credit card companies contained information for coupons issued for flights on connection carriers and thus not for class flights.[12] Thus, the TRW tapes contain names and addresses of persons associated with credit card numbers that may not have been utilized in the purchase of class flights.

Finally, the TRW list suffers from the same defects as the computer list rejected by the Fifth Circuit in *Nissan.* The list is over-inclusive to the extent the list contains the names and addresses of persons contractually responsible for payment of a particular credit card account but who are not purchasers. It is also under-inclusive because it does not contain the names and addresses of persons authorized to use the account who did purchase airline tickets, yet who are not contractually responsible to pay the bill. Thus, "[i]t is impossible to estimate how many absentee class members would receive individual notice." *Nissan,* 552 F.2d at 1099. When faced with

---

**11.** For example, the airlines specifically requested that in the following examples all names and addresses be retained:

| | |
|---|---|
| John R. Smith | John Smith |
| 123 Main St. | 123 Main St. |
| Paris, TX | Paris, TX |
| | |
| Mary Smith | M. Smith |
| 123 Main St. | 123 Main St. |
| Paris, TX | Paris, TX |
| | |
| J.R. Smith | John and Mary Smith |
| 123 Main St. | 123 Main St. |
| Paris, TX | Paris, TX |

*See* September 13 memo to TRW from Andrew Steinberg, attached as Exhibit C to Plaintiffs' Supplemental Memorandum in Support of Their Notice Proposal.

**12.** Delta sent TRW, American Express, Citicorp, and Discover suppression or replacement tapes that contained account numbers to be excluded from processing because they had been extracted from coupons for non-class flights. Weldon Affidavit at ¶¶ 22–23. However, data for two months had been cycled out of the on-line Delta system by the time Delta began eliminating connection carrier information from the data sent to third parties. Weldon Affidavit at ¶ 24; Tr. at 143–144.

this situation, the *Nissan* Court noted that "[i]t seems likely that mailing notice to every person listed in any California metropolitan telephone book could notify as many class members." *Id.*

■ For multiple reasons, therefore, the Court finds that the TRW tape is not a list of class members; rather it is at best a list of persons identified in some sense with particular credit card numbers.[13] The very fact that the number of names and addresses on the TRW list is greater than the number of accounts demonstrates that the list is not a list of class members. In addition, even if the TRW list were limited to one name and address per credit card number, there is no way to determine whom to select as the "purchaser" from the multiple names, both responsible and nonresponsible, associated with that account. None of the third parties involved in creation of the list apparently has any data that will enable it to make the determination of which if any of the persons within its databank was the purchaser of an airline ticket. *See* Collanzo Deposition at 144–145; Iannuzelli Deposition at 83. Any choice of a single name, therefore, would simply be "arbitrary." [14]

Accordingly, this is not the classic case where Rule 23(c)(2) individual notice is mandated. In cases such as *Eisen* and *Nissan* the records kept by defendants indisputably contained the names and addresses of the universe of class members. Notice to a list that included this universe as well as other non-class members would necessarily result in notice to a substantial number of class members. Because the TRW tape is not a list of class members, there is no way to assure that notice to the list would definitely result in notice to a substantial number of class members. In fact, notice by direct mail to the TRW list would most likely confuse the recipients and encourage claims by non-class members. The Court will not direct individual mail notice, therefore, to the TRW list.

■ Defendants not only contend that plaintiffs should be required to give individual notice to the TRW list compiled by the litigating defendants, they also insist that plaintiffs should conduct a similar search and matching process for the records of the settling and bankrupt defendants. In addition, defendants insist that plaintiffs must conduct a manual search of microfiche records maintained by all defendants to extract credit card numbers from those coupons used for class flights and then engage in the same process the airlines utilized with credit reporting agencies and credit card companies to compile a list of persons associated with those card numbers.[15] It is defendants' position that these efforts are reasonable and, therefore, must

---

**13.** Whether or not any information compiled by TRW for its customers is accurate is the subject of much speculation. TRW recently settled lawsuits brought by the Federal Trade Commission and nineteen state Attorney Generals alleging that TRW failed to maintain its computerized files accurately and failed to quickly verify information that consumers dispute. *See TRW Inc., v. Dan Morales, Attorney General of Texas,* Civil Action No. 3–91–1340–H, Northern District of Texas, Consent Order entered December 10, 1991; *Federal Trade Commission v. TRW Inc.,* Civil Action No. 3–91–2661–H, Northern District of Texas, Consent Order entered December 10, 1991 [784 F.Supp. 361]. *See also Credit Data Suit Settled By TRW—Company Will Try To Be More Careful,* N.Y. Times, Dec. 11, 1991, at C1; *TRW Forced To Alter Credit Reporting,* Atl. Const., Dec. 11, 1991, at B3.

**14.** This was the precise adjective adopted by counsel for defendants at the evidentiary hearing in explaining why the airlines had chosen not to select a single name for each credit card number. Tr. at 38.

**15.** United, Delta, and USAir maintain some data from flight coupons on microfiche after that data has been purged from their computerized databases. Seitz Affidavit at ¶ 6; Tr. at 132; Barrett Affidavit at ¶ 8. Delta Airlines maintained 16 months of data from ticket coupons on its computerized database for a period beginning in May, 1990, and ending August, 1991. Delta maintains the ticket coupon information for the remainder of the class period on microfiche. Tr. at 132. From January 1, 1988, to April, 1989, the tickets are recorded as they were received; subsequent to April of 1989, they are recorded by flight and date and a microfiche index exists by flight date. Tr. at 133. United maintains microfiche files that contain credit card numbers for tickets purchased by credit card on or after May 1, 1990, for which all coupons were accounted for more than 6 months ago. Seitz Affidavit at ¶ 6. USAir maintains ticket data on microfiche for some period. Barrett Affidavit at ¶ 8.

be conducted by plaintiffs in order to identify class members.

The *Nissan* court cautioned that the word "reasonable" in Rule 23 cannot be ignored. "In every case, reasonableness is a function of anticipated results, costs, and amount involved." 552 F.2d at 1099. The Court has already concluded that the process by which the TRW list was compiled was not designed to identify the name and address of the person who purchased the airline ticket; indeed, TRW has no data that would enable it to make that determination. Rather, in TRW's own words, the process it has employed has identified only those persons who are "in some way responsible for paying the account." Dong Affidavit at ¶ 9. The list derived from the credit card numbers through the process derived by defendants did not result in a list of class members. Accordingly, a search through the records of the non-litigating defendants or a search of the additional microfiche records of the litigating defendants to compile a list similar to the TRW list would produce no useful results.

In addition, to review the records and extract the data would require decades to accomplish,[16] at the end of which period plaintiffs would have a list of credit card numbers and not a list of class members.[17] The Court finds that the effort involved in the type of search initiated by defendants and in a manual search of tens of millions of microfiche records is neither reasonable nor required by Rule 23. After several months and some expense, the most that the defendants themselves could produce is a list of names and addresses of persons who in some sense are associated with credit card numbers, rather than a list of class members. The Court will not require plaintiffs to conduct a similar search of such massive proportion for negligible results. Based upon the defendants' answers to discovery, their affidavits, evidence presented at the October 22nd hearing, and representations of their counsel, the Court finds that there is no reasonable way in

16. A representative for Delta testified at the evidentiary hearing that there are at least tens of millions of tickets on Delta's microfiche that would have to be reviewed by hand. Tr. at 147–148. United maintains 18.5 million tickets on microfiche. Richard Seitz, representative of United Airlines, testified at his deposition that each microfiche record would take approximately four minutes to review. Seitz deposition at 69.

17. Defendants' reliance on *Dennis v. Saks* is misplaced. The District Court for the Southern District of New York in *Dennis v. Saks* certified a subclass of all charge customers of Saks with billing addresses in New York and Fairfield County who bought from Saks stores in the New York metropolitan area, since January 1, 1968, women's clothing with an aggregate sales value of $250 or more and whose names appeared in the computerized charge account list kept by Saks as of a certain date. Two similar subclasses were certified; one for Bergdorf–Goodman and one for Bonwit Teller. Because of the defendants' record keeping systems, the court noted that there were significant problems in identifying class members and the only possible way to do so would be to examine individual sales slips kept by the defendants. The court, however, found this to be a Herculean task noting that Saks estimated it would take 150 man-years and $2.5 million to complete the task for its records alone. Recognizing that it would be unreasonable to expect plaintiffs to spend that amount of time and money to identify class members, the court tailored the class to include only those charge account customers who appeared on the computerized databases of the defendants. The court rejected defendants' argument that plaintiffs should be required to search sales slips and then send individual notice to identified class members, finding that to be an unreasonable effort. The court instead ordered plaintiffs to mail notice to those charge account customers on defendants' computerized databases.

In *Dennis v. Saks* there was no dispute that the universe of the class members was in the computerized data banks and that the mail ordered by the court would reach each and every class member. No party suggested or offered publication notice. Thus, in *Dennis v. Saks,* the court did not order the mailing because the list was a list of class members; rather under the circumstances of that case, the court exercised its discretion and determined that the mailing to the list that contained the universe of class members was the best notice practicable under the circumstances. The class in *Dennis v. Saks* was readily identifiable and geographically limited. The circumstances of the airlines case is decidedly different. Defendants admit that the list of more than 9.3 million names and addresses does not contain the universe of class members. Indeed, defendants insist that in addition to mailing to that list, plaintiffs must be ordered to put into effect their publication notice proposal.

which defendants' records can be utilized to identify class members.

### B. Best Notice Practicable

Given that there is no other reasonable way to identify class members, the Court must determine what the best notice practicable is under the circumstances. Plaintiffs argue that inasmuch as there is no way to identify class members by reasonable effort, the best practicable form of notice to the class is through massive publication notice. Plaintiffs have developed a detailed plan for disseminating this notice. Defendants agree that plaintiffs' publication notice must be employed, but they contend further that it must be used in conjunction with individual notification of the names contained on the TRW list.

#### 1. Plaintiffs' Proposed Publication Program

■ Plaintiffs propose to publish the entire notice in newspapers of general circulation on one Sunday and the following Friday in each of the hub cities;[18] in 100 newspapers with the largest circulation in the United States (to the extent not covered by the dailies in the hub cities) and in other cities throughout the United States including at least one city in each state and in each metropolitan area with a population of 500,000 or more.[19] The notice would be published in full text, with a headline at the

top that would be of similar size to a subhead or headline in a newspaper. Tr. at 85.

Plaintiffs' media expert, Todd B. Hilsee, testified at the evidentiary hearing that he had caused the notice to be typeset in actual size to confirm that it would be legible and that the notice would run in the main news section of the newspaper.[20] Tr. at 83; 85. Research indicates that 95% of adults who subscribe to newspapers read the general news sections. Tr. at 97. Based on his experience in the advertising industry, Hilsee believed that the full notice with headline as plaintiffs propose would command a reader's attention. Tr. at 98. In addition, plaintiffs propose to publish the full notice in the national newspapers, *USA Today* and *The Wall Street Journal.* Hilsee explained that *USA Today* and *The Wall Street Journal* were included in the program because of their broad circulation and ability to reach incremental potential class members who are not already reached by the other newspapers in the proposal.[21] Tr. at 63. Plaintiffs also intend to publish the full form of notice once in *Newsweek, Time, U.S. News & World Report,* and in *Frequent Flyer Magazine* and in each defendant's inflight magazine. Hilsee testified that media market research indicates that between 60% of the readers of the three newsweeklies had flown on a domestic airline within the past year. Tr. at 66–67.

---

**18.** The hub cities are those identified in Plaintiffs' Second Amended Consolidated Class Action Complaint and are Atlanta, Baltimore, Charlotte, Chicago (O'Hare), Cincinnati, Cleveland, Dallas/Ft. Worth, Dayton, Denver, Detroit, Houston (IAH), Memphis, Minneapolis/St. Paul, Nashville, Newark, Philadelphia, Pittsburgh, Raleigh/Durham, Salt Lake City, San Jose, St. Louis, Syracuse and Washington (Dulles). In major cities where there is more than one large daily newspaper of general circulation, notice will be placed in more than one newspaper.

**19.** See Appendix I to Plaintiffs' Memorandum in Support of Their Proposed Form and Method of Notice, Exhibit A, for a listing of the newspapers in which they propose to publish notice.

**20.** The Court finds Mr. Hilsee's testimony to be credible. Mr. Hilsee's experience is in the advertising industry. It is his job to determine the

best way to reach the most people. Mr. Hilsee answered all questions in a forthright and clear manner. Mr. Hilsee performed additional research prior to the evidentiary hearing in response to certain questions that were put to him by defendants at his deposition. Rather than indicating a lack of expertise on Mr. Hilsee's part as the defendants contend, the Court believes that Mr. Hilsee enhanced his credibility when he deferred responding to defendants' deposition questions at a time when he did not have the responsive data available and instead utilized the research facilities normally used in his industry to provide the requested information.

**21.** According to Mr. Hilsee, media market research indicates that approximately 82% of readers of *The Wall Street Journal* and approximately 70% of *USA Today* readers have flown on domestic airline flights in the last year. Tr. at 63.

The potential readership of the notice in the Sunday newspapers identified by plaintiffs is 87,536,000, while the potential readership in the Friday newspapers is 80,693,000. Potential readership figures for *Newsweek, Time,* and *U.S. News & World Report* are 59,412,000 and for the selected travel magazines 10,058,000. Overall, gross readership figures from plaintiffs' proposed program could exceed 237,000,000; computer models designed to eliminate overlap estimate that this could result in more than 143,000,000 different people receiving notice. Plaintiffs' Notice Proposal at ¶ 6; Tr. at 95–96. Moreover, plaintiffs believe that the extensive publicity through travel columns, newspaper articles, trade publications, and television and radio reports will result in the notice reaching many millions of class members. Plaintiffs' Notice Proposal at ¶ 6.

The reach of the publication program proposed by plaintiff was supported by Hilsee's testimony. The 143,000,000 figure was arrived at after elimination of duplication of readership among the print media by calculations performed using software available to Hilsee's industry for that purpose. Tr. at 95. The software is based on standard industry reach curves, mathematical models, population figures, and readership survey data. Hilsee explained that, after refinement of the readership statistics by the highest standards in his industry, the estimate that 143 million persons would be reached by the plaintiffs' proposed notice program is not overstated. Tr. at 95–96.

In conjunction with publication of the full notice, plaintiffs intend to have Hilsee design a public awareness program to supplement the publicity generated by publication of the notice. The public awareness program will include court-approved informational releases sent to the broadcast and print media through electronic news dissemination services.[22] In addition, plaintiffs will send court-approved informational releases to travel editors, writers, columnists, and syndicated travel columnists at certain identified newspapers and at travel magazines with the largest circulations in the United States. The release would also be sent to travel industry publications and other media targeting both corporate and leisure travellers. Hilsee testified that the public awareness program proposed by plaintiffs would extend the visibility and effectiveness of the paid media schedule.[23] Tr. at 69. Hilsee also recommended the use of typeset articles that can be disseminated to weekly publications in smaller markets that are not covered by the major daily newspapers covered elsewhere in plaintiffs' proposal. Tr. at 70.

In addition to the informational releases and publication of the full notice, plaintiffs propose to post copies of the notice in defendants' ticket offices, to provide copies of the notice itself to those offices to be available upon request and to send a court-approved poster and bulk quantities of the notice to the approximately 36,000 travel agencies in the United States.[24] Plaintiffs' Notice Proposal at ¶ 4(d); Tr. at 72.

22. The services, such as the PR Newswire, reach daily newspapers in every major population area of the country, newswires (AP, UPI, Reuters, etc.), radio and television networks and stations in major markets across the United States, magazines covering business and finance, and trade presses in every major industry. Plaintiffs' Notice Proposal at ¶ 4(a).

23. Plaintiffs also submitted the declaration of one of their counsel to support the efficacy of publication notice in this case. As part of the media coverage of this Court's class certification order, *USA Today* ran a short report in which it gave its readers a post office box address opened by the plaintiffs with court approval to receive inquiries from the class. In response to that publication as well as other media reports, class counsel had received as of October 1, 1991

approximately 18,000 pieces of mail including letters, postcards, packets of information to support claims and a check in the amount of $25.00 (identified as a contribution towards plaintiffs' litigation costs). In addition, a substantial quantity of mail had been received at the offices of co-lead and liaison counsel. Mail had been received from residents of 49 of 50 states and from residents of 16 foreign countries.

24. Every form of notice and informational release would include a mailing address so that readers could elect to write and request that their names be placed on a mailing list. Persons who request that their names appear on the mailing list would receive future information about the litigation and any subsequent notices and a claim form by direct mail. Plaintiffs' Notice Proposal at ¶ 5.

In support of their contention that publication notice would be more effective than mail to the TRW list under the circumstances of this .case, plaintiffs submitted the affidavit of Peter N. Thompson, an attorney and professor of law at Hamline University School of Law. Thompson is one of the authors of a book that analyzes the notice, refund, and claims procedures used in *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 410 F.Supp. 706 (D.Minn.1975). Peter N. Thompson, A Class Action Suit That Worked (Lexington Books ed. 1978). In *Antibiotics,* individual notices were mailed upon order of court to between 9 million and 11 million households identified from telephone directories in six states. After the process was complete, the court stated: "At the present time, the Court feels that the benefit of the individual original notices was small as compared to the tremendous cost involved. A less expensive and more useful method should be studied." 410 F.Supp. at 710 n. 3. The court then commissioned a survey to attempt to determine the efficacy of the various types of notice. Thompson's affidavit focuses on the results of that survey regarding the evaluation of mailed notices as contrasted to notice by newspaper or publicity in newspapers.

Thompson attested that the survey showed that newspaper notice and news articles in newspapers had at least as great an impact on recollection of class members as did mailed notice. In addition, among the various media, newspapers were found to be the most effective means of communicating with people. Thompson concluded .that the survey showed that, at least in the *Antibiotics* case, the mailed notices were expensive and not effective. He noted that the cost of newspaper advertisements and newspaper publicity was insignificant as opposed to the cost of mailed notices. He attested that notice by mail in large consumer class actions clearly is not the best notice practicable when viewed in terms of cost and effectiveness.[25]

The plaintiffs' proposed notice program is not unique in form. Notice by publication, including posting, has been approved in several consumer class actions. See In re *Rohm & Haas Company* Civil Action No. 89–2724 (E.D.Pa.) (Shapiro, J.) (court approved notice procedure by publication in 44 newspapers and one magazine, as well as by sending copies of the notice to approximately 61,000 pharmacies whose names and addresses were provided by defendant, along with a letter requesting that the recipients post the notice in the pharmacies); In re *Beechnut Apple Juice Litigation,* Master File No. 86–6608 (E.D.Pa.) (Kelly J.) (notice to the consumer class published in two magazines and provided to

25. At the evidentiary hearing, defendants referred to a chart of response rates published in Vol. 2 of *Newberg on Class Actions,* 2d ed. (1985) at pp. 214–215, that defendants claim evidence the superiority of mail over publication notice. The Court notes that the *Newberg* material reports the percentage of class members who submitted claims in two cases and not the number of persons who received notice through mail or through publication. Whether class members are apprised of their rights is a very different question from whether class members ultimately make a claim. The critical issue before this Court is the reach of the notice under each party's proposal. An analysis of the cases reported in the *Newberg* material underscores the fact that claim response rates can be the result of a number of different factors other than the failure to receive notice. In *West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710 (S.D.N.Y. 1970), *aff'd.,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971), notice was published of a settlement with various political entities and other institutions and of the claims of individual consumers, including state claims as *parens patriae* on behalf of their citizens or on behalf of states as consumers and all other consumers in respective states. The published notice stated that failure to make a claim by a certain date would constitute authorization of the attorney general of the state to use whatever amount of money he recovered as the consumer's representative for the benefit of the state's citizens in such manner as the court directed. In other words, the states recovered for their citizens who did not choose to submit an individual claim. It is as reasonable to conclude that non-claimants were satisfied to have their share go to the states as to conclude that they did not see the notice. The other case reported in *Newberg* to which defendants referred, *Colson v. Hilton Hotels Corp.,* 59 F.R.D. 324 (N.D.Ill.1972), again involved proofs of claim and not receipt of notice, and there is no indication how many people saw the notice, but only how many claim forms were submitted.

food markets for distribution to consumer class members); *In re Arizona Dairy Products Litigation,* 1975–2 Trade Cases (CCH) ¶ 60, 555 (D.Ariz.1975) (court approved an abbreviated form of notice to be printed on defendants' milk cartons); *In re North Atlantic Air Travel Antitrust Litigation,* Civil Action No. 84–1013 (D.D.C.) (notice was provided to class members by publication of a summary notice in various newspapers and magazines, by sending a poster form of the summary notice to approximately 28,000 travel agents, along with a request that the notice be posted in their offices and by a poster form of the summary notice placed in the defendants' ticket offices); *Auto Parks Inc. v. Stanford Schmuckler, et al.,* Court of Common Pleas for the First Judicial District of Pennsylvania, August Term, 1974, No. 310, Order dated July 26, 1983 (court certified class of all persons who utilized parking lot facilities adjacent to certain rail stations in conjunction with their use of commuter rail lines and ordered notice to class members by the posting of class notices at each commuter rail station). In addition, there is no question that publication notice is constitutionally sufficient as to those persons who cannot be identified and therefore individually notified. *Mullane v. Central Hanover,* 339 U.S. at 317, 70 S.Ct. at 658; *Nissan,* 552 F.2d at 1097.

It is clear to the Court that the publication program outlined by plaintiffs is geographically broad and designed to reach the maximum number of class members. Plaintiffs' proposal is in large measure designed to target the members of the public who utilize airline transportation. As Hilsee testified, studies have shown that the vast majority of readers of several of the national publications in which plaintiffs propose to publish notice have flown within the past year. Tr. at 63; 67. Thus, Hilsee explained, 80 to 90 million readers of those publications who have flown within the past year will be reached by the publication notice. Tr. at 83–84.

Defendants do not criticize plaintiffs' notice program. To the contrary, defendants ask that the Court order plaintiffs to implement their notice program, with minor changes, in addition to the mail notice defendants desire. Defendants submitted no evidence that the reach of plaintiffs' program is overstated and do not dispute that the reach of the publication program would overlap that of mailed notice to the defendants' list. The only dispute defendants have with plaintiffs' program is they do not want notice posted on their property or in the in-flight magazines that are carried on defendants' airlines.[26] Defendants allege that to do so would violate their First Amendment rights. Defendants argue that the First Amendment protects them from being obliged to disseminate speech with which they disagree. In addition, defendants argue that because the notice will be adequately disseminated otherwise, there is no compelling reasons sufficient to overcome defendants' rights.

In response to defendants' First Amendment argument, plaintiffs contend that notice pursuant to Rule 23 is analogous to government speech that does not coerce private individuals (in this case the airlines) to endorse an ideological position. Rather, the notice is required by statute, approved

---

**26.** Defendants' in-flight magazines are: TWA Ambassador; American Way; Continental Profiles; Sky Magazine (Delta); Northwest; Pan Am Clipper; Skies America (Midway); and USAir Magazine. The readership of in-flight magazines, in which plaintiffs propose to publish the notice, are indisputably airline travellers. Defendants nonetheless take the position that plaintiffs should not be permitted to publish notice in in-flight magazines as those publications are placed in the seat pockets in defendants' own airplanes. However, it has been pointed out to the Court that, for example, defendant USAir hands out to passengers *The Wall Street Journal* and *USA Today,* publications which will contain the notice. Moreover, defendants' position is completely contrary to their professed desire that as many class members as possible receive notice and their professed concern that the dissemination of the notice be sufficiently broad that any determination of this suit will act as *res judicata* as to the class. Tr. at 33–34. The Court also notes that the inflight magazines, with the exception of American's, are independently published. *See, e.g.* Sky Magazine published by Halsey Publishing Co. (a copy of the masthead from Vol. 20 No. 10, October 1991 is attached). Thus, space for publication of the notice would be purchased from an independent publisher and not the airlines.

by the Court, and in effect, communicates the viewpoint of the government as a representative of the people. As such, plaintiffs argue that the government can require the defendants to post notices on their property.

The Court does not agree with plaintiffs that notice of this action is the equivalent to government speech that does not offend defendants' First Amendment rights. However, insofar as defendants' First Amendment rights are implicated, those rights are not absolute. Regulation of commercial speech is constitutional where (1) the state asserts a substantial government interest, (2) the regulatory technique is in proportion to that interest and (3) the incursion on commercial speech is designed carefully to achieve the state's goal. *Central Hudson Gas and Electric Corp. v. Public Service Comm.*, 447 U.S. 557, 564, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980).

The Court finds a substantial interest in assuring that the goals and requirements of the Federal Rules of Civil Procedure concerning class actions be implemented to protect the due process rights of all parties.[27] The notice designed by plaintiff and approved by defendants is consistent with this interest; it informs the parties of the pendency of the action and their accompanying rights in direct compliance with Rule 23(c). In addition, the notice to be posted on defendants' property in in-flight magazines is even-handed and will not prejudice the rights of defendants. Indeed, defendants agreed to much of the language in the notice. Under the test articulated in *Central Hudson Gas and Electric*, an order requiring that notice to the class be published in in-flight magazines that are carried on defendants' airplanes and posted in defendants' ticket offices does not offend the First Amendment.[28] Accordingly, the Court will direct that plaintiffs notify the class members by the publication program devised by plaintiffs, including notice in defendants' in-flight magazines and at their ticket offices.

### 2. Combination Notice

Defendants argue that the best notice practicable includes not only the publication notice outlined by plaintiffs, but also individual notice to the 9.3 million names on the TRW list ("combination notice"). The Court has already concluded that the TRW list is not a list of class members and, therefore, plaintiffs are not required under Rule 23 to provide individual notice. Defendants suggest in the alternative that should the Court find the TRW list over-inclusive, a list of indisputable class members—those individuals associated with credit cards that can be used by only one person and that were used to purchase tickets on class flights—can be *readily* compiled. Notice to this narrowed list coupled with publication notice by plaintiffs would, defendants assert, be the best notice practicable. We have now come full circle.

First, defendants contended in response to discovery requests and in submissions to

---

**27.** As defendants themselves have pointed out, adequate notice will ultimately provide defendants with *res judicata* protection.

**28.** Defendants' contention that under *Pacific Gas and Electric Co. v. Public Utilities Comm.*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986) this Court may not order notice posted on their property is mistaken. In *Pacific Gas*, the California Public Utilities Commission required the privately owned utility company to include in its billing envelopes the statements of a third party, an organization called Toward Utility Rate Normalization, that wanted to raise funds and communicate with rate payers. The utility company had exclusive use of its billing envelopes prior to the PUC's ruling and did not sell space to any third parties. The Commission's ruling required that the utility permit access to what had been a private forum for speech that was not content neutral. However, the *Pacific Gas* court noted that the Commission's order "is readily distinguishable from orders requiring appellant to carry various legal notices, such as notices of upcoming Commission proceedings or changes in the way rates are calculated", 475 U.S. at 16 n. 12, 106 S.Ct. at 911 n. 12. There was no dispute that an order requiring the utility to carry such legal notices on its property did not offend the First Amendment. Similarly, this Court finds that an order that the plaintiffs post the notice required by Federal Rules of Civil Procedure 23(c)(2) in defendants' ticket offices and publish the notice in in-flight magazines does not offend the First Amendment of the United States Constitution.

this Court that "there is no practical way to identify" purchasers of tickets. Defendants' Opposition To Plaintiffs' Amended Consolidated Motion For Class Certification at p. 34. Later, defendants claimed to have developed, through an exceedingly complex review, a list of 9.3 million purported class members. Now defendants insist they are "clearly capable" of preparing an accurate list of at least 2.9 million single-use accounts utilizing the same procedures that defendants have developed with the aid of third-party credit card companies and TRW. However, despite the fact that defendants claim to be able to compile this narrowed list with "push-button ease" and that nearly three months have elapsed since defendants' first voiced their readiness to narrow the TRW list, defendants have not come forward with the list of 2.9 million purportedly undisputed class members.

Putting aside the suspect ability of TRW to furnish any kind of dependable information,[29] the Court concludes that defendants' first and clearly stated position a year ago is the correct one—that a list of purchasers cannot be compiled through reasonable efforts.[30] It is the Court's opinion that any further expenditure of funds in an attempt to compile a list of questionable value and which at best would represent only a small fraction of the class [31] would be ill-advised. However, if defendants wish to pursue their offer to narrow the TRW list to include only single-use account holders, the Court will review the list, after giving plaintiffs an opportunity to respond, to determine if it is in fact an accurate list of class members. If defendants succeed in compiling an accurate list of class members, the Court will direct individual notice to the partial list. However, insofar as all parties agree that plaintiffs proposed publication program is acceptable and necessary, the Court will direct plaintiffs to proceed with the publication of notice at this time.

### III. *The Content of the Notice*

■ Determination of what is the best notice practicable under the circumstances of this case is not limited to a review of the method of dissemination of the notice, but also must include a review of the proposed content of that notice. Notice must not only reach the affected parties, but it must also convey its message in a meaningful way. The Fifth Circuit has described the standard to be applied as follows:

> [T]he notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

*Nissan,* 552 F.2d at 1105. A notice that is confusing to class members is not the best practicable under the circumstances. *See Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791 (10th Cir.1970); *Nissan,* 552 F.2d at 1104. While the parties have agreed on much of the content of the notice, there are a few areas of dispute concerning language and form.

### A. The Opt–Out Form

■ Defendants insist upon inclusion of a printed opt-out form with the published and mailed notice that must be completed and mailed to a post office box in order to effectuate a class member's request to be excluded from the class. Plaintiffs object to the use of any printed form and argue that inclusion of that form would confuse rather than assist class members. In support of their opposition to the inclusion of an opt-out form with notice to the class, plaintiffs submitted the affidavit of Arthur M. Kaplan, Esq., counsel for the City of Philadelphia in the class action *City of*

29. See footnote 14 *supra.*

30. The Court does not take lightly defendants' reversal of position or their implausible explanation for failure to make full disclosure as required by the spirit of the discovery rules. Based on submissions to the Court, it appears that defendants are less interested in notice to class members that comports with due process than in causing plaintiffs as much expense as possible.

31. Defendants most recently estimated the class size to be 50 million. Tr. at 48.

*Philadelphia v. American Oil Co.,* 53 F.R.D. 45 (D.N.J.1971).

In *American Oil,* the combined notice of the pendency of class action and of settlement included an opt-out form in addition to a claim form. Kaplan attested that a large number of class members returned both forms. The presiding judge in *American Oil* asked counsel from both sides to investigate the apparent inconsistency and counsel contacted class members who had returned the opt-out form. Counsel jointly reported to the court that there was widespread misunderstanding of the purpose and effect of filing such a form. Kaplan stated that many of the persons had signed and returned the opt-out form simply because it was enclosed without any real understanding of its purpose or effect. Kaplan attested that in none of the subsequent antitrust class actions in which he has been actively involved has a court approved inclusion of "opt-out" forms.

The possible confusion resulting from inclusion of such a form was also acknowledged in *Roberts v. Heim,* 130 F.R.D. 416, 423 (N.D.Cal.1988), where the Court refused to include an opt-out form with class notice on the basis that, "on balance, such a separate form will engender confusion and encourage investors to unwittingly opt out of the class." This Court agrees with plaintiffs that the inclusion of a preprinted opt-out form will confuse class members and result in unnecessary costs. Accordingly, an opt-out form will not be included in the notice published to the class.

### B. The "Lump Sum" Issue

Defendants insist that language be included in the notice on what the parties have referred to as the "lump sum issue" to the following effect:

If there is a finding after a trial that the defendants have violated the antitrust laws, individual class members may be entitled to damages once they prove that they are proper class members, that they have suffered injury and the amount of their damages. Such proof might require production of documents, out-of-court oral depositions, and jury trials.

Plaintiffs proposed language does not include reference to recovery by individual class members but merely states that "any recovery on behalf of the Certified Class by way of settlements or judgment after trial ... will be distributed to those members of the Certified Class who have filed claims." This area of disagreement is also reflected in the dispute over whether the appropriate language in the notice should be: "if a recovery is obtained" as proposed by plaintiff, rather than "if you obtain a recovery" as proposed by defendants.

Plaintiffs allege that each member of the class has been commonly impacted by defendants' actions. Plaintiffs' proposed notice language, therefore, clearly states that if a recovery is obtained, fees and costs may be awarded from that recovery. Plaintiffs contend that their language more fully advises class members of their rights. Defendants argue that any language outlining a possible lump sum recovery for the class is inappropriate because plaintiffs will be unable to prove damages by use of common proof.

In support of their position that class certification was appropriate, plaintiffs submitted the testimony of Dr. John Beyer, who identified at least three possible formulaic approaches to the computation of damages for each class member. Dr. Beyer opined that the three formulaic approaches would permit the calculation of a minimum overcharge applicable to all members of the class and that the use of those formulaic approaches would permit calculation of such minimum overcharges on a calendar, quarter-by-quarter basis for each defendant and for each hub. The Court found that Beyer's analysis met plaintiffs' burden to present the Court with a likely method for determining class damages.

The Court's determination regarding Dr. Beyer's methodologies was made for purposes of class certification only; it is premature to decide finally the damage methodology that will be applied in the event plaintiffs are successful in this litigation. Use of the language suggested by defendants, however, is at best premature and improperly prejudges the issue of the meth-

od for measuring damages. In addition, inclusion of defendants' proposed language would mislead the class. While the Court need not at this time determine what method of awarding damages is appropriate in this case, the Court does not believe it can absolutely foreclose a lump-sum recovery at this juncture as suggested by defendants. The language suggested by plaintiffs does not constitute a final determination on the lump-sum issue, nor is it confusing in the manner suggested by defendants. Accordingly, the Court will include the language proposed by plaintiffs and bracketed on pages 3–5 of Exhibit 1 to Appendix 1 of Plaintiffs' Memorandum in Support of Their Proposed Form and Method of Notice.

### C. Other Disputed Language

■■■ The Court has reviewed the remaining areas of dispute over the wording of the notice and will dispose of the matters summarily. The Court does not believe that it is necessary to repeat the date by which requests for exclusion or objections to the proposed settlement must be postmarked. That information is clearly stated in Section III.2 (exclusion from the certified class), Section III.3 (exclusion from the settlement class) and Section IX (objection to approval of the proposed settlements). Plaintiffs also contend that the notice should not include an invitation to persons who receive notice to direct any questions in writing to the Airlines Antitrust Litigation post office box. This Court agrees that the language in Section X proposed by the defendants is not necessary and, in any event, is contrary to the defendants' articulated position at the evidentiary hearing that plaintiffs should not be permitted to respond to class members except by court-approved communication. Tr. at 157–158.

Finally, defendants' proposed language that refers to receipt of notice by first class mail will not be included in the notice. The language suggested by defendants to the effect that the Court will make all appropriate efforts to be sure that the certified class does not expend dollars attributable to persons who are settlement class members only will be included in the formal notice.

### IV. *Conclusion*

The Court is convinced that the innovative notice program designed by plaintiffs not only comports with due process and is sensitive to defendants' res judicata rights, but it is the only notice program suitable for this unique and massive consumer class action. Now the time has come, after much delay, for consideration of the merits of plaintiffs' claims. The Court is prepared to proceed swiftly and efficiently to a resolution of this action.

Accordingly, the Court DIRECTS plaintiffs to submit to the Court by January 15, 1992, a final proposed notice in the form of an order, complete with the changes and additions authorized by this order. The Court DIRECTS defendants that any additional comments or objections concerning the notice *not previously stated* must be submitted to the Court by January 21, 1992. In addition, the Court DIRECTS defendants to submit any narrowed proposed list of class members to the Court within 30 days of the date of this order. Plaintiffs must submit any response to the list within 10 days of defendants' submission. In addition to the copies required by the Local Rules, all filings should be submitted on 5¼ inch floppy disks, formatted for MS–DOS and, if possible, compatible with WordPerfect 5.0 software. Finally, the Court GRANTS defendants' motion to supplement [# 176–1] and DENIES AS MOOT defendants' motion to preserve documents [# 172–1].

IT IS SO ORDERED.